IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FRANKLIN PUBLICATIONS, INC., | § | |
| | § | |
| Plaintiff, | § | Case No.: C2-05-1061 |
| | § | |
| vs. | § | Judge Watson |
| | § | |
| GENERAL NUTRITION CORPORATION, | § | Magistrate Judge King |
| | § | |
| Defendant. | § | |
| | § | |

## GENERAL NUTRITION CORPORATION'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

According to Rule 56 of the Federal Rules of Civil Procedure, defendant General Nutrition Corporation ("GNC") asks this court for partial summary judgment regarding the issue of actual damages. Specifically, GNC asks this court to render judgment that plaintiff Franklin Publications, Inc., take nothing on its claims for consequential damages, including any claim for lost profits not directly arising from any nonperformance of the contracts at issue.

In support of this motion, GNC has filed a separate memorandum of law and an appendix containing the evidence supporting this motion. As set forth more fully therein, the basis for judgment is that the contracts which form the basis for Franklin's claims are governed by the Uniform Commercial Code, under which a "seller" of goods may not recover consequential damages for repudiation of a contract. The evidence shows that Franklin seeks consequential damages in the form of lost future profits from potential advertisers—losses allegedly relating to the cessation of third-party contracts, not the underlying contracts in issue. GNC requests judgment that Franklin Publication take nothing on its claims for such damages. Should this court deny summary judgment on this matter, then pursuant to Rule 56(d), GNC asks the court to

specify the facts that are without substantial controversy, including the extent to which the fact and type of damages are not in controversy.

Respectfully submitted,

James D. Curphey (0015832), Trial Attorney
Constance M. Greaney (0059834)
Bryan R. Faller (0072474)
PORTER, WRIGHT, MORRIS & ARTHUR, LLP
41 South High Street
Columbus, Ohio 43215-6194
Telephone: (614) 227-2000
Facsimile: (614-227-2100
Email: jcurphey@porterwright.com
        cgreaney@porterwright.com
        bfaller@porterwright.com

-AND-

Ronald M. Gaswirth
Texas State Bar No. 07752000
*Pro Hac Vice*
Joe B. Harrison
Texas State Bar No. 09115500
*Pro Hac Vice*
Douglas D. Haloftis
Texas State Bar No. 08804400
*Pro Hac Vice*
GARDERE WYNNE SEWELL LLP
3000 Thanksgiving Tower, 1601 Elm Street
Dallas, Texas 75201-4761
Telephone: (214) 999-3000
Facsimile: (214-999-4667
Email: rgaswirth@gardere.com
        jharrison@gardere.com
        dhaloftis@gardere.com

**ATTORNEYS FOR DEFENDANT
GENERAL NUTRITION CORPORATION**

2

## MEMORANDUM IN SUPPORT
## OF GENERAL NUTRITION CORPORATION'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

## Summary of Argument

Franklin alleges a breach of two contracts whereby Franklin had agreed to produce and distribute to GNC stores and customers a certain number of copies of the magazines *Physical* and *Let's Live* that Franklin published.  Franklin seeks damages in the form of—among other things—lost profits from third-party advertisers who placed ads in these magazines.

The contracts were for the sale of goods, and so the U.C.C. governs the parties' contract dispute.  The parties' contract has connections with Ohio, Pennsylvania, and California, each of whom has adopted a version of the UCC.  The provisions of these states' respective versions of the UCC, however, do not differ about the remedies available to a seller such as Franklin.  Thus, this court may apply Ohio's UCC to the dispute at bar without regard to choice of law concerns.

The lost profits damages that Franklin seeks in the form of lost revenue from third-party advertisers constitute consequential damages.  Consequential damages from a breach of contract are the damages occurring not directly from the non-performance of the contract, but rather indirectly through impairment of the seller's relationship with or obligations to third parties.  Although Ohio courts have not directly addressed the issue under the UCC, decisions from other state and federal courts applying identical or almost identical UCC provisions are virtually in unanimous agreement that a seller-plaintiff cannot recover consequential damages.  The leading commentator White & Summers confirms this result.

Franklin's lost advertising revenue arising under contracts with third-party advertisers— as opposed to its publishing contract with GNC—are consequential damages that Franklin may

not recover under the UCC.  Therefore, partial summary judgment is appropriate that Franklin may not recover such damages on its breach of contract claims.

## Statement of Undisputed Facts

1.      Plaintiff Franklin Publications, Inc. ("Franklin"), is an Ohio corporation with its principal place of business in Columbus, Ohio.  Complaint for Declaratory Relief and Monetary Damages ("Complaint") at ¶ 2.

2.      Defendant General Nutrition Corporation ("GNC") is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.  Complaint at ¶ 3.

3.      Franklin was created in 1995 to purchase the right to publish two health magazines called *Let's Live* and *Physical*.  Complaint at ¶ 1; Appendix ("App."), Tab A, at 6, 9.[1]

4.      The magazine called *Let's Live* has been in existence for seventy years or more, with sales in health food stores and through subscriptions.  App., Tab A, at 19-20.

5.      The magazine called *Physical* was originally a sports nutrition insert in *Let's Live* magazine but garnered enough popularity for Franklin to begin publishing it as a separate magazine to appeal to "sports supplements" (i.e., body-builder) customers in Franklin's customer base.  App., Tab A, at 43-44.

6.      In 1999 Franklin signed agreements with GNC to publish and distribute to GNC stores and customers certain minimum numbers of *Let's Live* and *Physical* magazines, with an advertisement overlay, to be approved by GNC, wrapped around each copy.  App., Tab A, at 13, 21-22; Tabs B and C.

7.      In 2001 Franklin and GNC signed new agreements whereby Franklin agreed to

---

[1] The documents identified in Appendix Tabs A-G are Confidential pursuant to the terms of the Agreed Protective Order filed with this Court on March 6, 2006 and are filed separately under seal.

8.      publish and distribute copies of *Let's Live* and *Physical* to GNC customers under a similar arrangement regarding the advertisement overlay.  Complaint at ¶ 8; App., Tab A, at 31-32, 40; Tabs D and E.

9.      In 2004, GNC and Franklin once again signed new documents whereby Franklin would publish and distribute *Let's Live* and *Physical* magazine to GNC customers through 2009. Complaint at ¶ 9.

10.     Under these contracts, Franklin agreed to produce and ship each month to GNC customers and stores a specified number of copies of the magazine, and the price was based on a specified rate per copy of the magazine to be shipped App., Tab A, 110-114; Tabs F and G.

11.     Franklin hired the writers and editors to write for the magazine.  App., Tab A, 146-47.  Except for the advertising overlay, GNC had no rights under these agreements to approve the content of the magazines.  App., Tab A, at 14; App., at Tab D, at 2; Tab E, at 2.

12.     In 2005 GNC gave Franklin written notice, effective December 31, 2005, that any business relationship concerning GNC's purchase of *Let's Live* magazine and *Physical* magazine would end.  Complaint at ¶ 15.

13.     Franklin has sued GNC for breach of contract regarding GNC's termination of the agreements for *Let's Live* and *Physical* magazine.  Complaint at ¶¶ 27-32.

14.     Franklin believes that as a result of GNC's termination of the agreements for *Let's Live* and *Physical* magazine, Franklin lost advertising revenues from third parties who placed ads in the magazines.  App., Tab A, at 168-69.

15.     In addition to amounts paid per copy of the magazines by GNC, Franklin earned advertising revenues from third parties arising from the production and distribution of *Let's Live* and *Physical* magazines.  App., Tab A, at 137-140.

16.     In its complaint, Franklin seeks a declaratory judgment that GNC has liability for breach of the agreements in an amount exceeding $25,000, and Franklin seeks damages against GNC for breach of the agreements in an amount exceeding $25,000.  Complaint at 9.

## Argument

### I.     THE OHIO UCC GOVERNS FRANKLIN'S CLAIMS.

This is a diversity case, and so this court applies Ohio choice-of-law rules to determine what state's law will apply to the issues raised herein.  *See Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 604 (6th Cir. 2005); *Graham v. Am. Cyanamid Co.*, 350 F.3d 496, 506 (6th Cir. 2003). Under Ohio law, if the states whose law might apply to an issue would apply the same rule of law or would otherwise reach the same result, there is no conflict of law and thus no need for a choice of law analysis.  *Mecanique C.N.C., Inc. v. Durr Environmental, Inc.*, 304 F. Supp. 2d 971, 975-76 (S.D. Ohio 2004) (citing *Akro-Plastics v. Drake Indus.*, 115 Ohio App. 3d 221, 685 N.E.2d 246 (1996)).  That is the case here.

The Uniform Commercial Code has been adopted by Pennsylvania, where GNC has its principal office; California, where Franklin has its headquarters; and Ohio, where Franklin is incorporated and has a principal office.  Article 2 of the Code applies to a "sale of goods."  OHIO REV. CODE § 1302.02.  "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities, and things in action . . . ."  *Id.* § 1302.01(8). To determine whether GNC's contract to have Franklin manufacture and mail the magazines is a "sale of goods" under the Code, these states would each apply the "predominant purpose" test. *Filmservice Laboratories, Inc. v. Harvey Bernhard Enters., Inc.*, 208 Cal. App. 3d 1297, 1305, 256 Cal. Rptr. 735, 739 (1989); *Allied Erecting & Dismantling Co. v. Auto Baling Co.*, 69 Ohio

App. 3d 502, 508, 591 N.E.2d 259, 263 (1990); *Whitmer v. The Bell Tel. Co.,* 361 Pa. Super.

282, 288, 522 A.2d 584, 587 (1987).  Because among the three states no conflict exists regarding

this test, the "predominant purpose" test that these states all share applies to this issue.

This court may make a "predominant purpose" decision by a summary judgment ruling

based on undisputed facts.  *Mecanique C.N.C., Inc. v. Durr Environmental, Inc.*, 304 F. Supp. 2d

971, 976-77 (S.D. Ohio 2004).  In *Mecanique* the question was whether a contract for installation

of ductwork involved a sale of goods under the UCC.  This court said:

> The mere fact that a manufacturer utilizes its effort and expertise in producing a
> good does not mean that the buyer is purchasing those services instead of the
> good itself.  The question is whether the purchaser's ultimate goal is to acquire a
> product or procure a service . . . .  The installation service provided by Plaintiff,
> though extensive, was merely incidental to Durr's purpose of procuring the
> necessary ductwork . . . Plaintiff's compensation was tied to the goods produced
> rather than the labor provided.  There was no separate price for installation.
> Though the good produced was a unique product created in accordance with
> specifications, CNC played no role in the design of the product.  Even more
> significantly, the parties did not contemplate that CNC would be involved in any
> ongoing servicing or testing of the ductwork once it was installed.  CNC's job
> was to provide a product in accordance with certain specifications.  Once that
> product was created and installed, CNC had no further role.

*Id.* at 977-78.

As in *Mecanique*, so also here the ultimate goal was to acquire a product rather than a

service.  The contract was for a product: magazines that Franklin would produce and ship to

GNC customers and stores.  The price was based on the amount of product: a specified rate per

copy of the magazine to be shipped.  That such a contract involves the sale of goods is shown by

cases from other jurisdictions where courts held that a contract to produce magazines or similar

publications involved the sale of goods—even though the contract required the physical printing

of the magazines.  *Gross Valentino Printing Co. v. Clarke*, 120 Ill. App. 3d 907, 910-11, 458

N.E.2d 1027, 1030 (1983); *Cardozo v. True*, 342 So. 2d 1053, 1055 (Fla. Ct. App. 1977)

(contract for printing of books); *Erin Printing & Promotional Marketing, Inc. v. Convum, LLC,*

No. M2003-1449-COA-R3-CV, 2005 WL 366895, at *2-3 (Tenn. Ct. App. 2005) (contract for the production of catalogues); *Comack Merchandising, Inc. v. Highland Group*, 932 F.2d 1196, 1201 (7th Cir. 1991) (contract to produce recipe brochures for a "pizza promotional project"). Thus, the Uniform Commercial Code governs the contract law issues in this case.

## II.  UNDER THE UCC FRANKLIN CANNOT RECOVER CONSEQUENTIAL DAMAGES.

For its breach of contract claims, Franklin may not recover an award of damages based on lost revenues from third-parties who allegedly would have advertised in the magazines. The reason is that such lost revenues constitute consequential damages, and the Uniform Commercial Code does not grant a seller such as Franklin the right to recover such damages.

Franklin was the seller and alleges the repudiation of the contract by GNC as the buyer. Complaint at 5 ¶ 15. Regarding that claim, article 2 of the Code provides that Franklin may either (a) resell goods identified to the contract and recover the price, or (b) recover damages for non-acceptance of the goods or, in a proper case, the contract price. Ohio Rev. Code § 1302.77.[2] Franklin does not assert that it has resold goods identified to the contracts, so Franklin's damages remedy, if any, is for non-acceptance of the goods or for the price of the contract.

The Code provides that "the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in section 1302.84 of the Revised Code, but less expenses saved in consequence of the buyer's breach." *Id.* § 1302.82(A). Where this measure of damages is inadequate to put the seller in as good a position as

---

[2] : "Where the buyer wrongfully . . . repudiates . . . the aggrieved seller may: (A) withhold delivery of such goods; (B) stop delivery by any bailee as provided in section 1302.79 of the Revised Code; (C) proceed under section 1302.78 of the Revised Code respecting goods still unidentified to the contract; (D) resell and recover damages as provided in section 1302.80 of the Revised Code; (E) recover damages for non-acceptance as provided in section 1302.82 of the Revised Code or in a proper case the price as provided in section 1302.83 of the Revised Code; (F) cancel. Ohio Rev. Code § 1302.77.

performance would have done, "the measure of damages is the profit, including reasonable overhead, which the seller would have made from full performance by the buyer, together with any incidental damages provided in section 1302.84 of the Revised Code, due allowance for costs reasonably incurred, and due credit for payments or proceeds of resale." *Id.* § 1302.82(B).

The "incidental damages" a seller may recover "include any commercially reasonable charges, expenses, or commissions incurred in stopping delivery, in the transportation, care, and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." *Id.* § 1302.84.

Alternatively, a seller can recover the contract price. Thus, if the buyer fails to pay the price when it comes due, the seller may then recover "the price (1) of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer; and (2) of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing." *Id.* § 1302.83(A).

These are the seller's sole damages remedies for repudiation of the contract. The UCC does recognize "consequential damages" as comprising an element of the ***buyer's*** remedy for a seller's breach. *See id.* § 1302.87 (providing that "the measure of damages for non-delivery or repudiation by the seller" includes consequential damages provided in section 1302.89"); *id.* § 1302.89 (defining "[c]onsequential damages resulting from the seller's breach"). But no UCC provision recognizes consequential damages as comprising an element of the ***seller's*** remedy for the buyer's breach. Indeed, the UCC unequivocally precludes a seller from seeking consequential damages allegedly resulting from a buyer's breach. The Code states that "neither

consequential or special nor penal damages may be had except as specifically provided in those chapters or by other rule of law." *Id.* § 1301.06(A).

In short, the UCC does not grant Franklin a right to recover consequential damages resulting from the alleged breach of the agreements by GNC. The Uniform Commercial Code treatise by White & Summers succinctly summarizes the state of the law on this issue:

> May the seller ever recover consequential damages for the breach of a sales contract? The answer in all appellate opinions that have discussed that question to date—at least the superficial answer—is "no." Consequential damages are specifically granted to the buyer under section 2-715. Section 1-106(1) states that consequential or other such damages are not available unless they are specifically provided for "in this Act or by other rule of law." Reading the explicit grant in 2-715 together with the restriction in 1-106, courts have concluded that the drafters did not intend to give the seller consequential damages. The courts seem also to have concluded that the words "or otherwise resulting from the breach" in 2-710 itself do no authorize recovery of consequential damages.

1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 7-16, at 412 (4th ed. 1995). Therefore, this court may grant partial summary judgment that Franklin may not recover consequential damages for the alleged breach.

### III. FRANKLIN CANNOT RECOVER LOST PROFITS FROM THIRD PARTY CONTRACTS.

Lost revenues resulting from breach of contracts or relationships that the seller has with third parties is the classic case of consequential damages that the UCC precludes a seller from recovering. This is apparent from the decision in *Petroleo Brasileiro v. Ameropan Oil Corp.*, 372 F. Supp. 503 (E.D.N.Y. 1974), where the court said the following in distinguishing between consequential damages and incidental damages under the UCC:

> While the distinction between the two is not an obvious one, the Code makes plain that incidental damages are normally incurred when a buyer (or seller) repudiates the contract or wrongfully rejects the goods, causing the other to incur such expenses as transporting, storing, or reselling the goods. On the other hand, consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the

breach, and which were reasonably foreseeable by the breaching party at the time of contracting.

*Id.* at 508-09; *see also Mead Corp. v. McNally-Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1209 n.17 (6th Cir. 1981) (interpreting Ohio UCC) (concluding that "consequential damages usually encompass lost profits expected under contracts between the aggrieved party and third parties, and other expenses not incurred in order to cure the immediate defect in performance.").

In the present case, Franklin's lost revenues from the third-party advertisers would constitute consequential damages in this sense. Although no Ohio case appears to have directly addressed this issue, other states' courts have determined that such lost revenues are impermissible "consequential damages" under the UCC. Because one express purpose of the UCC is to "make uniform the law among the various jurisdictions," Ohio Rev. Code § 1301.02, Ohio courts routinely look to other states' laws in determining how to apply the Ohio version of the UCC. *See, e.g., Mid-America Tire, Inc. v. PTZ Trading Ltd.*, 95 Ohio St. 3d 367, 385, 768 N.E.2d 619, 635 (2002) (reviewing various states' laws in interpreting interplay between UCC article 5 and the UCP governing letters of credit); *Saturn of Kings Automall, Inc. v. Mike Albert Leasing, Inc.*, 92 Ohio St. 3d 513, 519, 751 N.E.2d 1019, 1025 (2001) (referring to Texas law in support of court's interpretation of R.C. 1302.44). Case law from other jurisdictions confirms that the seller's lost profits from third-party contracts are improper "consequential damages."

In *Atlantic Paper Box Co. v. Whitman's Chocolates and Pet, Inc.*, 844 F. Supp. 1038 (E.D. Pa. 1995), Whitman's had breached a promise to buy $1.3 million worth of Valentine Day candy boxes from Atlantic Paper. Whitman's was subsequently acquired by the Russell Stover Company, which manufactured its own candy boxes. Atlantic brought suit and alleged that its damages included not only the lost profit on the sale of the candy boxes but also the withdrawal of an offer from a potential purchaser to buy Atlantic Paper. The court granted Whitman's

motion to dismiss this latter request for consequential damages—revenues lost when the sale of the company to a third party did not go through. The court held that the UCC "does not provide sellers of goods with a remedy for consequential damages." *Id.* at 1040-41; *see also Associated Metals & Minerals Corp. v. Sharon Steel Corp.*, 590 F. Supp. 18, 21-22 (S.D.N.Y. 1983) (applying Pennsylvania law and concluding that "the UCC does not provide the remedy of consequential damages for aggrieved sellers"), *aff'd*, 742 F.2d 1431 (2d Cir. 1983).

In *Nobs Chemical, U.S.A., Inc. v. Koppers Co.*, 616 F.2d 212 (5th Cir. 1980), the seller was a middleman who maintained no inventory facilities and thus purchased from its supplier only to fill existing orders. The buyer's breach caused the seller to substantially reduce its order from its supplier, and as a result, the seller could not take advantage of a quantity-discount purchase price. The seller paid the supplier an additional $25.00 per ton for the goods, thereby reducing the seller's profit by $75,000 when the product was resold to its other customers. The court denied recovery for this part of the seller's claim, concluding by a process of elimination that it was in the nature of unrecoverable consequential damages because the loss did not fall within the ambit of the Code's definition of incidental damages. *Id.* at 216-17.

In *USX Corp. v. Union Pacific Resources Co.*, 753 S.W.2d 845 (Tex. App.—Fort Worth 1988, no writ), the buyer breached a contract to purchase cumene (a hydrocarbon used as an additive for high-octane motor fuel). The seller claimed incidental damages for the decline in value of pre-purchased benzene, a necessary component for the manufacture of cumene. The seller reasoned that, but for its contract with the buyer, it would have waited to purchase benzene until later in the summer after the market price for benzene had substantially declined. The higher price paid on the early benzene purchase thus reduced the profitability to the seller of sales to its other customers of cumene manufactured from the high priced benzene. Relying on

the *Nobs Chemical* case, the court concluded that the seller's "remote profit" claim did not constitute incidental damages as defined by the Code and thus represented unrecoverable consequential damages. *Id.* at 855-56.

In *Sprague v. Sumitomo Forestry Co.*, 709 P.2d 1200 (Wash. 1985) (en banc), the court rejected the seller-logger's claim for incidental damages in the nature of profits lost on third-party contracts which the seller was unable to honor because of the buyer's delay in performing the breached contract. The court rejected the seller's assertion that the loss was in the nature of incidental damages; the court reasoned that the seller incurred this loss as a consequence of his delay in performing his contract with a third-party. The fact that the buyer's conduct caused the seller's loss was irrelevant. "The focus is upon losses arising within the scope of the immediate contract." Id. at 1206.

In *Twin Creeks Entertainment, Inc. v. U.S. JVC Corp.*, No. C-93-4104 MHP, 1995 WL 86563 (N.D. Cal. Feb. 22, 1995), a buyer had promised to purchase 60,000 motion picture videos from seller, seller entered into royalty contract with Paramount to purchase twelve motion pictures in video format for $600,000. Buyer repudiated and seller sought both lost profits on video cassette sales and losses stemming from royalties due to Paramount under the motion picture contract. The court held that royalty losses were consequential damages and therefore not recoverable under the UCC. *Id.* at *5 ("A comparison of section 2710, which deals with the 'incidental' damages recoverable by a seller, and section 2715, which addresses the 'incidental' and 'consequential' damages that a buyer may recover, support the conclusion the Code's silence is an intentional exclusion of consequential damages for plaintiff-seller.").

Similarly, courts have found that the following losses incurred in connection with the buyer's breach were not recoverable by the seller as consequential damages: foreign banking

interest penalties incurred by the seller in financing the contracted goods, *Petroleo Brasileiro v. Ameropan Oil Corp.*, 372 F. Supp. 503, 508-09 (E.D.N.Y. 1974); finance charges on loans previously incurred to facilitate performance or allegedly necessary to sustain the seller's business following the buyer's breach, *Firwood Manufacturing Co. v. General Tire, Inc.*, 96 F.3d 163, 170-71 (6th Cir. 1996); and a seller's "loss of its business" or the "loss of the sale of its business" allegedly resulting from the buyer's breach, *Florida Mining & Materials Corp. v. Standard Gypsum Corp.*, 550 So. 2d 47, 49 (Fla. App. 1989).

## IV.   GNC CANNOT BE CHARGED WITH KNOWLEDGE OF THIRD-PARTY CONTRACTS.

Under the UCC, consequential damages for **buyers** fall within well-defined categories and are not without limit:  special notice of their likely occurrence is required. *See* Ohio Rev. Code § 1302.89(B) ("Consequential damages resulting from the seller's breach include: (1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know . . . ."). Outside the UCC the same principle applies. *See Charles R. Combs Trucking, Inc. v. International Harvester Co.*, 12 Ohio St. 3d 241, 244, 466 N.E.2d 883, 887 (1984) (holding that lost profits may be recovered if, among other things, the profits were within the contemplation of the parties at the time the contract was made). It thus would be unfair to charge GNC with constructive knowledge of the possibility or extent of damage to Franklin arising out of revenues lost from third party contracts. Where would one draw the line? What about lost revenue if another store decides to cease distributing Franklin's magazines because of GNC's breach? What if Franklin is prohibited from renewing a business lease because the landlord is unsure about the company's health in light of GNC's departure? What if Franklin negotiated a bad deal for itself, resulting in losses far beyond what GNC would have contemplated had it been negotiating the deal on Franklin's behalf? GNC cannot be held liable for those speculative damages. That is why the UCC expressly excludes consequential

damages and allows a seller to recover damages that flow directly from loss of the performance of its contract. In short, Franklin is entitled only to the benefit of its bargain with GNC, not the benefit of its bargain with third parties.

## V.    CONCLUSION.

The foregoing demonstrate that so-called "remote lost profit" cases involve a seller's claim for losses associated with third-party contracts—whether caused due to decreased profits or lost profit opportunities. Except for the alleged direct causal connection between the loss and the buyer's breach, the contracts themselves have no relationship with the breached contract. Because Franklin's lost advertising revenue is related to its inability to continue performance under third-party contracts, it not a loss "arising within the scope of the immediate contract" and therefore is properly characterized as non-recoverable consequential damages. Franklin thus cannot recover damages for GNC's breach of the *Let's Live* and *Physical* agreements relating to lost advertising revenue that Franklin may claim it would have received from third-party advertisers had GNC not stopped buying the magazines.

For all the reasons stated above, GNC requests a summary judgment order from this court that:

- declares that Franklin Publications, Inc., may not recover, for breach of the contracts with GNC, any lost future profits from potential advertisers and any other damages not directly arising from nonperformance of the contracts;

- rules that Franklin Publications, Inc., shall take nothing on its breach of contract claims with respect to consequential damages, including any lost future profits from potential advertisers and any other damages not directly arising from nonperformance of the GNC contracts;

- alternatively, specifies pursuant to rule 56(d) those facts that are without substantial controversy, including the extent to which the fact and type of damages sought are not in controversy;

- grants such further relief as is just and equitable.

Respectfully submitted,

/s/ Constance M. Greaney
James D. Curphey (0015832), Trial Attorney
Constance M. Greaney (0059834)
Bryan R. Faller (0072474)
PORTER, WRIGHT, MORRIS & ARTHUR, LLP
41 South High Street
Columbus, Ohio 43215-6194
Telephone:  (614) 227-2000
Facsimile: (614-227-2100
Email: jcurphey@porterwright.com
        cgreaney@porterwright.com
        bfaller@porterwright.com

-AND-

Ronald M. Gaswirth
Texas State Bar No. 07752000
*Pro Hac Vice*
Joe B. Harrison
Texas State Bar No. 09115500
*Pro Hac Vice*
Douglas D. Haloftis
Texas State Bar No. 08804400
*Pro Hac Vice*
GARDERE WYNNE SEWELL LLP
3000 Thanksgiving Tower, 1601 Elm Street
Dallas, Texas 75201-4761
Telephone:  (214) 999-3000
Facsimile:  (214-999-4667
Email: rgaswirth@gardere.com
        jharrison@gardere.com
        dhaloftis@gardere.com

**ATTORNEYS FOR DEFENDANT
GENERAL NUTRITION CORPORATION**

## CERTIFICATE OF SERVICE

I certify that on May 5, 2006, I electronically filed the foregoing with the CM/ECF system, which will send notification of such filing to the following counsel and parties of record:

Bruce L. Ingram
Vorys, Sater, Seymour & Pease LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008

James E. Arnold
Clark, Perdue, Arnold & Scott Co. LPA
471 East Broad Street, Suite 1400
Columbus, Ohio 43215-3583

/s/ Constance M. Greaney
Constance M. Greaney

COLUMBUS/1300087 v.01